1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF ALASKA

3   MARY MILLER, AS PERSONAL          )

4   REPRESENTATIVE FOR THE            )

5   ESTATE OF SARAH JAMES,            )

6            Plaintiff,               )

7       vs.                           )

8   THE SOUTHEAST ALASKA              )

9   REGIONAL HEALTH CONSORTIUM,       )    Case No. J04-0014 CV (RRB)

10  MT. EDGECUMBE HOSPITAL            )

11  AND DEPARTMET OF HEALTH           )

12  & HUMAN SERVICES, UNITED          )

13  STATES OF AMERICA,                )

14           Defendants.              )

15  _____  )

16                C E R T I F I C A T I O N

17       I, CLAUDIA FAYE DONNALLY, a Notary Public in and for the

18  State of Alaska, residing in Sitka, Alaska, in said State do

19  hereby certify:

20       That the following pages numbered 1 through 65 contain a

21  full and correct transcript by me to the best of my knowledge

22  and ability from the one cassette tape in the matter of DR.

23  THOMAS CONLEY.  Also are Exhibits 1 and 2.

24       DATED AT Sitka, Alaska this 12th day of October, 2005.

25                              Claudia Faye Donnally
                                Claudia Faye Donnally

                    CLAUDIA'S CONFIDENTIAL
              SECRETARIAL AND BOOKKEEPING SERVICE
CLAUDIA DONNALLY 105 SHULER DRIVE  *  SITKA, AK 99835  (907) 747-8091

RECEIVED

FEB 1 5 2006

CLERK, U.S. DISTRICT COURT
JUNEAU, ALASKA

1               IN THE UNITED STATES DISCTRICT COURT

2                   FOR THE DISTRICT OF ALASKA

3   MARY MILLER, AS PERSONAL          )

4   REPRESENTATIVE FOR THE            )

5   ESTATE OF SARAH JAMES,            )

6            Plaintiff,               )

7       vs.                           )

8   THE SOUTHEAST ALASKA              )

9   REGIONAL HEALTH                   )     Case No. J04-0014CV (RRB)

10  CONSORTIUM,                       )

11  MT. EDGECUMBE HOSPITAL            )

12  AND DEPARTMENT OF HEALTH          )

13  & HUMAN SERVICES, UNITED          )

14  STATES OF AMERICA,                )

15           Defendants.              )

16  _____       )

17               DEPOSITION OF DR. THOMAS CONLEY

18      APPEARANCE FOR THE            Michael Jude Pate, Esquire

19      PLAINTIFF:                    Law Offices of Jude Pate &

20                                    David Voluck

21                                    320 Seward Street

22                                    P.O. BOX 6384

23                                    Sitka, Alaska         99835

24  ///

25                              -1-

| | |
|---|---|
| 1   APPEARAANCE FOR THE | Daniel Cooper, Esquire |
| 2   DEFENDANTS: | Assistant U.S. Attorney |
| 3 | Federal Building & |
| 4 | U.S. Courthouse |
| 5 | 222 West Seventh Avenue, #9 |
| 6 | Room 253 |
| 7 | Anchorage, Alaska 99513-7567 |
| 8   APPEARANCE: | MRS. MARY MILLER |

9   Deposition of DR. THOMAS CONLEY, a witness of lawful age,

10  taken on behalf of the Plaintiff, in the above-entitled cause

11  pursuant to NOTICE OF DEPOSITION, before Claudia Faye Donnally,

12  a Notary Public in and for the State of Alaska, on the 27th day

13  of September, 2005, beginning at 1:30 p.m., of said day, at the

14  office of Michael Jude Pate, 320 Seward Street, Sitka, Alaska

15  99835.

16                         PROCEEDINGS

17      COURT REPORTER:     Dr. Thomas Conley, would you raise your

18  right hand, please?

19      DR. CONLEY:         Do you want me to stand up?

20      COURT REPORTER:     No, that's fine.  Do you promise to

21  tell the truth, the whole truth and nothing but the truth, so

22  help you God?

23      DR. CONLEY:         I do.

24      MR. PATE:           Shall I begin, Madam Clerk?

25                            -2-

1    COURT REPORTER:    Um hum, proceed.

2    MR. PATE:    Good afternoon, Dr. Conley.  I am going

3  to hand you what's been marked as Plaintiff's Exhibit 1.

4    DR. CONLEY:    Okay.

5    MR. PATE:    I will give a copy of this to Mr.

6  Cooper.  Madam Clerk, I will provide you with the original

7  sticker but for right now I will hold onto it and give it to you

8  at the end, they are the same copy.  So Dr. Conley, … .

9    DR. CONLEY:    Um hum.

10    MR. PATE:    … where do you, where are you employed?

11    DR. CONLEY:    SEARHC Mt. Edgecumbe Hospital.

12    MMR. PATE:    How long have you been employed there?

13    DR. CONLEY:    Ten years, nine-and-a-half years.

14    MR. PATE:    And what's your capacity over there?

15    DR. CONLEY:    Pediatrician.

16    MR. PATE:    Do you know, or did you know a woman by

17  the name of Sarah James?

18    DR. CONLEY:    Yes.

19    MR. PATE:    Okay.  Were you ever her treating

20  physician?

21    DR. CONLEY:    I was for admission back in 2000.

22    MR. PATE:    Does that window, is the breeze too

23  cold for you there, should I shut that or is it okay?

24    DR. CONLEY:    No, that's … .

25                           -3-

1   MR PATE:    Um, and so back in December of 2000?

2   DR. CONLEY:   Yes, that's correct.

3   MR. PATE:    Do you remember the date that Mrs.

4 James was admitted?

5   DR. CONLEY:   I don't remember off the top of my

6 head, but I could look at the record.  It is 12, the 4th of

7 December of 2000.

8   MR. PATE:    Do you remember why she was admitted?

9   DR. CONLEY:   She was brought to the emergency room

10 after she had fallen at home and she was admitted for

11 observation.

12   MR. PATE:    Were x-rays taken upon her admission?

13   DR. CONLEY:   Yes, they were.

14   MR. PATE:    And do you remember the results of what

15 those x-rays showed?

16   DR. CONLEY:   She had a fracture of one wrist and I'm

17 not sure which one it was, anyway one wrist.  I think it was the

18 right one.  And she had a couple of old fractures, compression

19 fractures of thoracic vertebrae.  And an old fracture of one of

20 her humurus which would be the upper arm.  And she had no other

21 fractures that I found.

22   MR. PATE:    On page 5 of the Exhibit 1 that I

23 handed you … .

24   DR. CONLEY:   Um hum.

25            -4-

1          MR. PATE:          If you would look, I believe it's on

2     the fourth line there of the brief history.

3          DR. CONLEY:          Sure, this is a discharge summary.

4          MR. PATE:          The fourth line there I think it will

5     tell you which wrist.

6          DR. CONLEY:          Yes.

7          MR. COOPER:          Counsel, for the record can you tell me

8     what the HHS number is, to make sure that I'm on the same page?

9          MR. PATE:          HHS-777.

10          MR. COOPER:          777, okay.

11          DR. CONLEY:          Blood count, blood test.

12          MR. PATE:          Okay.  And so that was what those x-

13     rays showed then?

14          DR. CONLEY:          Yes.

15          MR. PATE:          And all the rest were negative?

16          DR. CONLEY:          The rest of them, well they weren't

17     negative.  Some of them showed old fractures but that would be

18     on the new fracture.

19          MR. PATE:          What was Mrs. James mental stage?

20          DR. CONLEY:          She was quite demented and it waxed and

21     waned.  Sometimes she was in contact with what was going around,

22     on around her and sometimes she wasn't feeling contact,

23     particularly at night.

24          MR. PATE:          What do you call that when somebody

25                                          -5-

1 | starts to lose it at night?

2 | DR. CONLEY:        Sundowning, sundowning.

3 | MR. PATE:          So Mrs. James was prone to this?

4 | DR. CONLEY:        She seemed to be prone to it.

5 | MR. PATE:          Was that dementia long standing?

6 | DR. CONLEY:        I'm not really sure, it was present at

7 | the time of admission.

8 | MR. PATE:          How did it exist prior to that?

9 | DR. CONLEY:        That's right.

10 | MR. PATE:          I'm sorry, how did the existing happen?

11 | DR. CONLEY:        It had existed prior to that.

12 | MR. PATE:          What are some of the characteristics of

13 | dementia?

14 | DR. CONLEY:        Um, not infrequently, people who are

15 | demented tend to be some bad shaded, excuse me.  They have

16 | difficulty with short-term memory, less frequently with long

17 | term memory.  They have difficulty with reasoning skills, draw

18 | conclusions from the evidence in front of them.

19 | MR. PATE:          Sometimes they wander of get lost?

20 | DR. CONLEY:        They can.

21 | MR. PATE:          They could forget what surroundings

22 | they are in?

23 | DR. CONLEY:        Sometimes they will, yes.

24 | MR. PATE:          Um, what did you, do you know anything

25 |

-6-

1   else, I guess, remarkable about Mrs. James upon her admission?

2       DR. CONLEY:        She had a number of medical problems.

3       MR. PATE:          Was she suffering from deafness?

4       DR. CONLEY:        She had hearing difficulties, yes.

5       MR. PATE:          Was the deafness severe?

6       DR. CONLEY:        Reasonably severe, yes, um hum.

7       MR. PATE:          Had she had problems with her sight?

8       DR. CONLEY:        Not to my knowledge.

9       MR. PATE:          Are you aware she ever had cataract

10  surgery?

11      DR. CONLEY:        Not right off the top of my head, no.

12      MR. PATE:          I'll ask you to turn to page six of

13  Exhibit 1, and for counsel's information that is HHS-778.

14      MR. COOPER:        Okay.

15      MR. PATE:          The, I guess, last sentence of the

16  first partial paragraph on that page.

17      DR. CONLEY:        Okay, bilateral cataract surgeries.

18      MR. PATE:          So Mrs. James had cataract surgery in

19  the past?

20      DR. CONLEY:        That's correct.

21      MR. PATE:          Do you have any idea of what the state

22  of her vision was at that point?

23      DR. CONLEY:        Typical cataract surgery improves your

24  vision substantially.

25                          -7-

1      MR. PATE:              Do you have any memory of what Mrs.

2   James's vision was at that point, whether or not the cataract

3   surgery had, I guess, had a proved positive effect, or do you

4   know?

5      DR. CONLEY:            I do not know.

6      MR. PATE:              Okay.   Was Mrs. James suffering from

7   delirium?

8      DR. CONLEY:            Not to my knowledge, no.

9      MR. PATE:              What is delirium?

10     DR. CONLEY:            Very ill defined, it's a psychiatric

11  term.   It generally denotes a state of hyper-agitation that

12  accompanies certain stages of dementia, sometimes that occurs

13  secondary to chemical imbalances.   And is usually characterized

14  by agitation, screaming.   Sometimes is characterized by

15  uncontrolled actions, moving around, you know, running, fleeing,

16  things of action.

17     MR. PATE:              Ill ask you to turn to page 8 of

18  Exhibit 1, it's HHS-780.

19     DR. CONLEY:            Right.

20     MR. PATE:              And the past history, would you tell us

21  what this particular page is?

22     DR. CONLEY:            That is … .

23     MR. PATE:              Is that a History and Physical … .

24     DR. CONLEY:            Examination Report.

25                                 -8-

1  MR. PATE:            And is it a, I guess is recorded upon
2  admission.

3  DR. CONLEY:          It's recorded on admission.

4  MR. PATE:            I'll ask you to …

5  DR. CONLEY:          Yes.

6  MR. PATE:            … look at the past history section.

7  DR. CONLEY:          Um hum.

8  MR. PATE:            Um, what does number three say?

9  DR. CONLEY:          Dementia.

10  MR. PATE:            And number twelve.

11  DR. CONLEY:          Ah, bilateral hearing defect.

12  MR. PATE:            Does it indicate that it's still a
13  major problem?

14  DR. CONLEY:          Still a major problem.

15  MR. PATE:            So it's still a major problem.   I'm
16  sorry, I think we talked over the top of each other.

17  DR. CONLEY:          Yes, it's still a major problem.

18  MR. PATE:            Thank you.   And number fifteen.

19  DR. CONLEY:          Delirium.

20  MR. PATE:            All right.   I'll ask you to, well do
21  you remember Mrs. James being irascible, and I don't know if I'm
22  saying that, approaching that right.

23  DR. CONLEY:          She was irascible at the time of the
24  arrival in the emergency room.

25                                    -9-

1    MR. PATE:              What do you mean by that, what did you

2  say … .

3    DR. CONLEY:            Oh, I'm not sure, irascible is easily

4  agitated, angry is a term for it.

5    MR. PATE:              Okay.  How long did you spend with Mrs.

6  James upon admission?

7    DR. CONLEY:            I, I have no clear or independent

8  recollection.  From the nature of the history it was a

9  reasonably long period of time.

10   MR. PATE:              Did the, I don't know this, but at the

11 bottom of page nine of Exhibit 1 … .

12   DR. CONLEY:            Um hum.

13   MR. PATE:              … there are some times indicated there.

14   DR. CONLEY:            Ah, that has, you mean "D" and "T"?

15   MR. PATE:              Yes, sir.

16   DR. CONLEY:            That means dictated and translated.

17 That has no bearing on how long one would have spent.

18   MR. PATE:              Okay.  Do you have any approximation of

19 how long you spent with her?

20   DR. CONLEY:            Well with an admission like this it

21 would probably be forty-five minutes to an hour.  I should say

22 that it's, and that would be over a period of time since x-rays

23 had to be taken and looked at, and so forth.

24   MR. PATE:              So it wasn't a continuous necessary,

25                               -10-

1  continuous forty-five minutes, is that what you mean?

2      DR. CONLEY:        Yes, probably not.

3      MR. PATE:          Okay.  And you did the admission and

4  the write ups of these papers that we've just been looking at.

5      DR. CONLEY:        That's true.

6      MR. PATE:          Do you note prescribing any medications

7  for Mrs. James to take at that time?

8      DR. CONLEY:        As far as I know according to the

9  emergency room slips she was given a small amount of Ativan in

10  the emergency room.

11      MR. PATE:          Okay.  What is Ativan?

12      DR. CONLEY:        It's a Benzodazeopine drug similar to

13  Valium.

14      MR. PATE:          What are the affects of on the patient

15  who takes Ativan?

16      DR. CONLEY:        The purpose of the Ativan is to calm

17  the individual if the, it's destined to calm the individual

18  down, sometimes makes them a little bit sleepy.

19      MR. PATE:          Does it disorient them at all?

20      DR. CONLEY:        It can, an overdose.

21      MR. PATE:          If a person is already disoriented

22  could that compound the effect?

23      DR. CONLEY:        Ah, yes, it could.

24      MR. PATE:          Did you prescribe any other

25                          -11-

1  medications?

2      DR. CONLEY:          Not to my knowledge, not in the

3  emergency room.

4      MR. PATE:            So this was all done in the emergency

5  room?

6      DR. CONLEY:          Ah, the Ativan was given in the

7  emergency room to my knowledge.

8      MR. PATE:            Okay.  And I'd ask you to turn to page

9  twelve of Exhibit 1, and that is HHS-784.

10     DR. CONLEY:          Um hum.

11     MR. PATE:            Could you tell us what this page is?

12     DR. CONLEY:          Um, let's see, it's the admission

13  orders.

14     MR. PATE:            Are these drawn up by you?

15     DR. CONLEY:          They are in my handwriting, yes.

16     MR. PATE:            What date are they indicated as?

17     DR. CONLEY:          12/4 is the or 12/4/2000.

18     MR. PATE:            In at what time?

19     DR. CONLEY:          1600, that would be 4:00 in the

20  afternoon.

21     MR. PATE:            Could you tell us what the first line

22  says, or do they, oh no, I guess it's in the column drug orders.

23     DR. CONLEY:          Patient deaf and tends to sundown.

24     MR. PATE:            And the next one.

25                              -12-

1    DR. CONLEY:          Threat to wander and fall.

2    MR. PATE:            And I guess would you just continue on

3    down the lines and tell us what they read.

4    DR. CONLEY:          Diagnosis is multiple trauma.  Left

5    wrist splint.  Percoset one every six hours for pain.

6    Urinalysis on ward, CBC done in emergency room.  Ativan half a

7    milligram p.o. or i.m. of to six hours prm agitation.  Prm on

8    Proregnata means as necessary.  It means as necessary.  Regular

9    diet - no milk products.  U.S of four while awake.  Holdol one-

10   half a milligram at bedtime.  Ambulate with supervision.

11   MR. PATE:            Okay.  So Mrs. James took Ativan in the

12   emergency room and then did you, just tell what you prescribed,

13   two Ativans I guess.  Is that it?

14   DR. CONLEY:          Pain medication and Holdol at bedtime

15   for sleep.

16   MR. PATE:            Okay.  And the pain medication, would

17   that by the Percoset?

18   DR. CONLEY:          That's right.

19   MR. PATE:            Are there any side effects that come

20   with Percoset?

21   DR. CONLEY:          Ah, constipation, it reduces pain and

22   also can reduce pulse and blood pressure to some extent.

23   MR. PATE:            Any dulling of the senses at all?

24   DR. CONLEY:          It can, yes.

25                        -13-

1       MR. COOPER:        How about Holdol, is it Haladal or

2    Holdol?

3       DR. CONLEY:        Holdol.

4       MR. COOPER:        Holdol.

5       DR. CONLEY:        Yes.

6       MR. PATE:          What does that do?

7       DR. CONLEY:        Ah, it is used for a number of things,

8    the agitation, for, it's an anti-sycotic in small doses and a

9    half-milligram is a very small dose.  It's used for agitation

10   and helps sleep.

11      MR. PATE:          Does it have, does Holdol have any side

12   effects?

13      DR. CONLEY:        It can cause something referred to as

14   tarda disusa which is a side effect that results in strange

15   motions of the face like that, and in some cases it causes

16   difficulty in swallowing.  Generally speaking it's something

17   that happens after a fairly long period of time of using it.

18      MR. COOPER:        Just before you ask the next question,

19   counsel, for the record when the doctor said facial gestures

20   like that, he was tweaking his … .

21      DR. CONLEY:        Oh, I was … .

22      MR. COOPER:        … like his left eye in the waving kind

23   of motion.

24      MR. PATE:          Yes.

25                              -14-

1    MR. COOPER:        Thank you.

2    MR. PATE:          Yes, I would agree with that for the

3    record.  Does Holdol have any other side effects, dulling the

4    senses, disorientation?

5    DR. CONLEY:        In significant overdose, yes.

6    MR. PATE:          Do you remember, is there any way you

7    can tell us from these records, or if there are any other

8    records that you have or are going to look at that, meaning the

9    times when you saw Mrs. James?  Did any of these records, did

10   the records we just looked at tell you that, or the approximate

11   times that you saw Mrs. James.

12   DR. CONLEY:        Um, I remember seeing her in the

13   emergency room working her up, sending her for x-rays, looking

14   at the x-rays, coming back and looking at her, see her very

15   shortly after she got on the floor.  And then being called a

16   short time later after she fell out of bed.

17   MR. PATE:          Okay.  Seeing her on the floor.

18   DR. CONLEY:        Well you asked me, in the ward, on the

19   floor.

20   MR. PATE:          Okay, so you don't mean falling down?

21   DR. CONLEY:        Yes.

22   MR. PATE:          Okay.  On page twelve which is HHS-784.

23   DR. CONLEY:        Um hum.

24   MR. PATE:          I think it indicates, your notes start

25                              -15-

```
 1   12/4/1600.

 2        DR. CONLEY:           Okay, where are you?

 3        MR. PATE:             Page 12 of 22.

 4        DR. CONLEY:           Page 12 of 22.

 5        MR. PATE:             Do you see that bottom left hand

 6   corner, right.

 7        MR. COOPER:           That's, I think it's right here.

 8        MR. PATE:             It's up at the top of the page.

 9        DR. CONLEY:           Right.

10        MR. PATE:             Do you see the notation where it says

11   December 4, 1600?

12        DR. CONLEY:           Yes.

13        MR. PATE:             Is that, would that indicate when you

14   began seeing … .

15        DR. CONLEY:           No, no, it indicates when I wrote the

16   orders.

17        MR. PATE:             When you wrote these, okay you would of

18   seen her before this but at that time you wee talking about

19   prior to this.

20        DR. CONLEY:           Yes.

21        MR. PATE:             Okay.  Did you have occasion to see

22   Mrs. James later on that same day?

23        DR. CONLEY:           Yes.

24        MR. PATE:             Could you tell us about that?

25                                    -16-
```

1    DR. CONLEY:              What time are you talking about?

2    MR. PATE:                What was the next time, you wrote up

3 the order at about 4:00.

4    DR. CONLEY:              That is right.

5    MR. PATE:                The page that we just looked at, page

6 12 of Exhibit 1.

7    DR. CONLEY:              Um hum.

8    MR. PATE:                And you said that you saw her again at

9 some point later.

10    DR. CONLEY:              I couldn't tell you exactly when I saw

11 her up on the floor, up on the ward.

12    MR. PATE:                And, and what did you see up on the,

13 that she was in bed?

14    DR. CONLEY:              That she was knocked out, you know, she

15 was still complaining of pain.

16    MR. PATE:                Had she fallen at that point?

17    DR. CONLEY:              Yes.

18    MR. PATE:                Okay.  Do you remember anything about

19 the bed?

20    DR. CONLEY:              It had bed rails on it.

21    MR. PATE:                The bed rails were up?

22    DR. CONLEY:              Um hum.

23    MR. PATE:                Do you remember how many rails were up?

24    DR. CONLEY:              I think both rails on both sides of the

25                                           -17-

1  bed were up.  Would be fairly foolish to only have one of them
2  up.

3      MR. PATE:              Well are there some beds that have more
4  than two rails?

5      DR. CONLEY:            Not to my knowledge there are not.  We
6  have some that have rails on both sides but they are split rails
7  meaning that there's one at the top and one at the bottom of the
8  bed.  If I remember correctly this is one of the older beds that
9  had metal rails on it and there was one on each side of the bed.
10  It extended most of the way of the bed.

11      MR. PATE:              Do you have any information as to that,
12  it was an older bed, the make, the model, anything of that sort?

13      DR. CONLEY:            I have no idea.

14      MR. PATE:              Do you know where I might find that at
15  the hospital?

16      DR. CONLEY:            Ah, no, I don't.

17      MR. PATE:              Was, were there any other, I guess,
18  safety measurements taken besides bed rails?  And I'm talking
19  about keeping Mrs. James in bed from falling out.

20      DR. CONLEY:            Yes, she was in the room immediately
21  next to the nursing station that has a window between the
22  nursing station and the room in which she was housed.  And the
23  other safety precaution that is used is to have her evaluated,
24  or I'm sorry, seen by the nursing staff on a fifteen minute

25                              -18-

1  basis.

2       MR. PATE:            So it wasn't constant then, it was just

3  every fifteen minutes then.

4       DR. CONLEY:          That's right.

5       MR. PATE:            Was there a bed alarm attached?

6       DR. CONLEY:          I don't know.

7       MR. PATE:            Were there any restraints, soft or

8  otherwise or any sort of restraints on Mrs. James?

9       DR. CONLEY:          No, they are prohibited.

10      MR. PATE:            They are prohibited?

11      DR. CONLEY:          That's right.

12      MR. PATE:            How, why, what prohibits them?

13      DR. CONLEY:          It's required by the rules that the

14  minimum restraint necessary is what's required.

15      MR. PATE:            Hum.

16      DR. CONLEY:          One can only go to more vigorous

17  restraints if one has the evidence that the individual has

18  harmed themselves or harmed someone else.

19      MR. PATE:            And which rules are you referring to

20  when you say that?

21      DR. CONLEY:          Hospital, Federal, State.

22      MR. PATE:            And which hospital rules in particular,

23  like there are some in existence on December 3rd, 2000?

24      DR. CONLEY:          Yes.

25                             -19-

1       MR. PATE:         Do you know where I might find copies

2 of those?

3       DR. CONLEY:      They have them in the policy manual at

4 the hospital.

5       MR. PATE:         Um, is there, do you know where I would

6 find a copy for 2000?  I've been provided with a copy of 2004 as

7 it was revised in 2004.

8       DR. CONLEY:      I have no idea, you would have to ask

9 the hospital.

10       MR. PATE:         Okay.

11       MR. COOPER:      Counsel, just for the record, Joy

12 Blanchette, the Administrator of Nursing Services would be the

13 person, would be best able to respond to that.  She will return

14 to Sitka on or about October 17th.

15       MR. PATE:         I'm sorry, Mr. Cooper, did you, are you

16 referring to Joy Blanchette?

17       MR. COOPER:      Yes, isn't that what I said?

18       MR. PATE:         Okay, I couldn't hear, I was, my head

19 was over here when you spoke.

20       MR. COOPER:      I'm sorry, yes.  Yes, Joy Blanchette,

21 the Administrator of Nursing Services, October 17th, 2005, she

22 will be returning.

23       MR. PATE:         Thank you, Mr. Cooper.  Did you observe

24 anything else, I guess at that time you told us that the bed

25                           -20-

1  rails were up.  It's an older model of bed that Mrs. James was

2  put next to the, immediately next to the nursing station.

3        DR. CONLEY:          That's right.

4        MR. PATE:            And did you say that they could see her

5  from there?

6        DR. CONLEY:          Yeah, there's a window between the

7  nursing station and that room.

8        MR. PATE:            Where is the window in relation to

9  where the nurses are at, do you know?

10       DR. CONLEY:          The nurses sit here, the window is here

11  at the top.

12       MR. PATE:            Is it in a line?

13       DR. CONLEY:          That's right, yes.

14       MR. PATE:            Okay.  And you said that there was some

15  sort of policy, or direction to have staff check every fifteen

16  minutes on Mrs. James … .

17       DR. CONLEY:          Yes.

18       MR. PATE:            … but it was not constant?

19       DR. CONLEY:          No, it was not constant.

20       MR. PATE:            Is there anything else about that that

21  you think is important that we should know about that at that

22  moment?

23       DR. CONLEY:          No.

24       MR. PATE:            Okay.  After that, and do you recall

25                                  -21-

1  what time that was?

2      DR. CONLEY:        Well I, you know, it says that she, I

3  wrote the orders at 1600.

4      MR. PATE:        Um hum.

5      DR. CONLEY:        I, as far as I know, I dictated the,

6  the, well as I said, as far as I know I dictated the History and

7  Physical Report throughout the emergency room.  So I must have

8  written the orders in the emergency room at 1600.  And I

9  dictated the History and Physical on 1643, so that was all done

10 in the emergency room.  I would have seen her up on the ward

11 subsequent to that.

12     MR. PATE:        Okay.  At some point did you learn that

13 Mrs. James had fallen out of bed?

14     DR. CONLEY:        Yeah, I had gone up and seen her after

15 she was admitted.  She was in bed, I was called back relatively,

16 shortly after I had visited her in her bed, or in her room

17 probably no more than about fifteen minutes.  And she had,

18 according to the nurses, crawled over the bed railing and fallen

19 on the ground.

20     MR. PATE:        I will ask you to turn to page twenty-

21 two and twenty-two is the last page of Exhibit 1, it's HHS-812.

22     DR. CONLEY:        Um hum.

23     MR. PATE:        There is a notation there that is dated

24 December 4th, is that, is there a notation there made by you?

25                              -22-

1       DR. CONLEY:          That's correct.

2       MR. PATE:            And could you tell us what it says?

3       DR. CONLEY:          Fall from bed when climbed over rails.

4 Has right pareetal-occepetal hematoma.  (Unintelligible) on her

5 head.  Not previously seen.  Posey, etc.  Neuro unchanged.  No

6 obvious area of injury and no complaint, however again agitated

7 secondary use of the posey.  Funder normal, companic membranes

8 normal, neurology to normal.

9       MR. PATE:            What's, you referenced posey, what is

10 that?

11       DR. CONLEY:          It was after she fell out of bed, the

12 posey was put on her because she had demonstrated that she was a

13 risk to fall.

14       MR. PATE:            Okay.  Um, and … .

15       MR. COOPER:          Excuse me, counselor.  Just in date of

16 your question; Doctor, he needs to know exactly what a posey is.

17       MR. PATE:            I'm sorry, I wasn't listening to it,

18 thank you.

19       DR. CONLEY:          Okay, a posey is a vest that looks

20 somewhat like a vest, such as that would be worn by somebody

21 across the heart.  And it has straps on it that go around the

22 patient and can be tied to the bed or to some other object.  It

23 leaves the patient's arms and legs free.  It's the second level

24 of restraint.

25                             -23-

1    MR. PATE:              What is the first level of restraint?

2    DR. CONLEY:            Bed rest.

3    MR. PATE:              What is the third level of restraint?

4    DR. CONLEY:            Four points soft and the restraints,

5  well two or four points soft piece restraints.

6    MR. PATE:              Okay.  So the posey is second and the

7  third is four point soft restraints?

8    DR. CONLEY:            Probably, I guess the fourth or the

9  third would be two point soft restraints.

10   MR. PATE:              And what is that?

11   DR. CONLEY:            That would be cloth binding on the

12 wrists that are tied to the bed.  And then the next step would

13 be 4.5 soft restraints which is all four extremities.  And the

14 fifth level would be leather restraints.

15   MR. PATE:              When a person is put, a patient is in a

16 posey … .

17   DR. CONLEY:            Um hum.

18   MR. PATE:              … and is properly, I guess, done … .

19   DR. CONLEY:            Um hum.

20   MR. PATE:              … can a person get out of bed?

21   DR. CONLEY:            Yes, yes, they can.

22   MR. PATE:              What does it take?

23   DR. CONLEY:            Ah, determination.

24   MR.PATE:               Does it, how great of a resistance does

25                                    -24-

1    it provide?

2         DR. CONLEY:         It usually is effective.  Certainly a

3    patient who is extremely agitated and determined to get out of

4    bed can do so.  The healthier the person, the stronger they are,

5    and the more likely they are to defeat the posey.

6         MR. PATE:          And was Mrs. James … .

7         DR. CONLEY:         Yes.

8         MR. PATE:          … in a posey, sorry, go ahead.

9         DR. CONLEY:         All right, keep going.

10        MR. PATE:          Was Mrs. James in a posey before she

11   fell out of bed?

12        DR. CONLEY:         No, she was not.

13        MR. PATE:          Okay.  The notation there indicates

14   that you read to us, it says fall from bed and climbed over the

15   rail.

16        DR. CONLEY:         Um hum.

17        MR. PATE:          And it indicates December 4th, 1900.

18        DR. CONLEY:         That's when I wrote them, the note.

19        MR. PATE:          So at some point prior to that Mrs.

20   James fell out of bed.

21        DR. CONLEY:         That's correct.  Now there is a, if you

22   are interested there's a medically blow-up that indicates that

23   she fell on the floor at 1700.

24        MR. PATE:          Okay.  And so you entered that notation

25                                   -25-

1  at … .

2       MR. COOPER:          Excuse me.  I, could, where are you

3  saying that there's a notation, Doctor, that she fell on the

4  floor at 1700?

5       DR. CONLEY:          Nursing: patient arrived on floor at

6  1700, medicated.  Oh, I'm sorry.  No, it doesn't, I'm sorry, my

7  apologies, my error.  That's a note from 1930.

8       MRS. MILLER:         I need to go out, thank you.

9       MR. COOPER:          She wants to stop the proceeding?

10      MRS. MILLER:         No, I want to go home.

11      MR. PATE:            Are you okay?

12      MRS. MILLER:         No.

13      MR. PATE:            Okay, if you don't mind let's go off

14  record, let's go off record for a second.

15      COURT REPORTER:      Okay, off record.

16      COURT REPORTER:      Back on record.

17      MR. PATE:            For the record, Mrs. Miller is no

18  longer present.  Dr. Conley, … .

19      DR. CONLEY:          Um hum.

20      MR. PATE:            … yes, I'm sorry and I, we were going

21  over about times, do the notes indicate when the fall occurred?

22      DR. CONLEY:          Yeah, I just read through the notes and

23  they, it indicates the patient arrived on the floor at 1700

24  which would be 5:00.  She was medicated at 1730, which would be

25                              -26-

1  5:30 with one Percoset and half a milligram of Ativan.  And she

2  had a bed alarm on and it was working appropriately.  The

3  patient was assisted to the bathroom.  She was assisted with

4  ambulations to the bathroom.  And then at 1830 she crawled over

5  the bed rail and fell to the floor.

6      MR. PATE:          Does it indicate anything about the bed

7  rail, I mean the bed alarm the second time that she actually

8  fell over the … ?

9      DR. CONLEY:         In other words, was it on when she

10  crawled over the bed?  Is that the question that you are asking?

11      MR. PATE:          I guess, yes, sir.

12      DR. CONLEY:         There is no indication one way or the

13  other.

14      MR. PATE:          Do you remember?

15      DR. CONLEY:         I have, no, I do not remember.

16      MR. PATE:          What's, how does the bed alarm work, do

17  you know?

18      DR. CONLEY:         It's a dead man switch.

19      MR. PATE:          I don't know what that is.

20      DR. CONLEY:         Ah, in a train, a locomotive, they

21  conduct clearance or the engineer is connected to the throttle

22  with a cord, such as you have in an outboard motor that you … .

23      MR. PATE:          Oh, yeah, okay.

24      DR. CONLEY:         … if he falls down then the cord is,

25                              -27-

1  you know, activated and the alarm goes off.

2      MR. PATE:            So … .

3      DR. CONLEY:          And in that case then the engine stops.

4      MR. PATE:            All right and so it indicates the bed

5  alarm works when the patient was assisted to the bathroom.

6      DR. CONLEY:          That's correct.

7      MR. PATE:            So is it any indication, how does it,

8  if it's, I guess the patient would have to take off the, or

9  somehow it has to be disconnected if the patient goes to the

10  bathroom?

11      DR. CONLEY:          That's right.

12      MR. PATE:            And then is it reinserted?

13      DR. CONLEY:          That's correct.

14      MR. PATE:            So is there any indication that the bed

15  alone is reinserted?

16      DR. CONLEY:          It doesn't state specifically, no.

17      MR. PATE:            Do you know if it was?

18      DR. CONLEY:          I do not know of my own knowledge.

19      MR. PATE:            Okay.  Were you present when Mrs. James

20  fell?  Did you actually see her?

21      DR. CONLEY:          No, I was not.

22      MR. PATE:            Um, would you remember if you were?

23      DR. CONLEY:          Yes, I'm sure I would.

24      MR. PATE:            And it notes there, just a little bit

25                          -28-

1  further, it says Dr. Conley present at time of fall and helped

2  patient back into bed.  Is that accurate?

3      DR. CONLEY:        It's not accurate.  I could have been

4  right next door to help.  I do seem to remember helping her into

5  bed actually.

6      MR. PATE:          Okay.

7      DR. CONLEY:        But I was not present at the time she

8  fell.

9      MR. PATE:          Do you know if anybody saw Mrs. James

10 fall?

11     DR. CONLEY:        I don't know.  They could have seen her

12 through the window but I, there's no way to know for sure.  It

13 doesn't state specifically.

14     MR. PATE:          After the fall, did Mrs. James, did you

15 do x-rays of Mrs. James?

16     DR. CONLEY:        I went over physically and ordered some

17 x-rays on the next floor.

18     MR. PATE:          Okay.  Do you remember what the results

19 of those x-rays were?

20     DR. CONLEY:        No change except that she had a

21 fracture, an intertrochanteric fracture of her hip.

22     MR. PATE:          And I'm sorry, the inter … .

23     DR. CONLEY:        Right.

24     MR. PATE:          You used a word inter … .

25                             -29-

1    DR. CONLEY:      Intertrochanteric.

2    MR. PATE:      … intertran … .

3    DR. CONLEY:      Intertrochanteric.

4    MR. PATE:      … what does that mean?

5    DR. CONLEY:      If you look at the femur, … .

6    MR. PATE:      Um hum.

7    DR. CONLEY:      … that has a ball on top and a

8 protrusion on the side like this if you remember seeing pictures

9 of a skeleton.  And the distance between this protrusion and the

10 ball of the femur is second, it would be the intertrochanteric

11 target.  It refers to the neck of the femur.

12    MR. PATE:      Okay.  So did, does it say that Mrs.

13 James broke her femur actually or was it her (unintelligible)?

14    DR. CONLEY:      The hip is the femur.

15    MR. PATE:      Okay.  Was there any other, I guess,

16 and had that break existed prior to the fall from bed?

17    DR. CONLEY:      No, it did not.  The x-rays had been

18 done the previous day when she was admitted and the fracture was

19 not there, and it was there the next morning.

20    MR. PATE:      Did the x-rays actually show anything

21 else in addition to, an additional break or fracture to the … ?

22    DR. CONLEY:      No.

23    MR. PATE:      I ask you to look at page 11 of 22,

24 that's HHS-783.

25                          -30-

1    DR. CONLEY:        11 OF 22.

2    MR. PATE:          Yes. Sir.

3    MR. COOPER:        Okay, just so the record will be a

4 little bit clearer.  This is a, appears to be or purports to be

5 a Teleradiology Consultation from the Alaska Native Medical

6 Center.  It's a document that was produced by Health and Human

7 Services and the United States Government.  It bears the

8 signature line for John Lapkass.

9    DR. CONLEY:        M.D.

10   MR. COOPER:        The fact you may question and so far as

11 the witness has independent knowledge or recollection of the

12 here-say document.

13   DR. CONLEY:        Um hum.

14   MR. PATE:          Do you, and I really, well when we get

15 there, we will pursue it.  Do you recognize this document?

16   DR. CONLEY:        It's a note from John Lapkass, he's an

17 orthopedic surgeon in Anchorage.

18   MR. PATE:          Did you send x-rays of Mrs. James to

19 Dr. Lapkass?

20   DR. CONLEY:        I did.

21   MR. PATE:          Okay.  And did you send the x-rays you

22 took both before and after the fall?

23   DR. CONLEY:        I don't remember off the top of my

24 head, but I would assume that that probably indicates that.

25                              -31-

1      MR. COOPER:        I ask that we take a moment and let the
2  doctor read the entire thing before we continue examination.
3      MR. PATE:        That's fine, Mr. Cooper.
4      COURT REPORTER:        Should we go off the record?
5      MR. PATE:        I believe so, okay, Mr. Cooper?  Off
6  record, yes.
7      COURT REPORTER:        Off record.
8      COURT REPORTER:        Back on record.
9      MR. PATE:        Dr. Conley, have you had a chance to
10  review the page 11 of Exhibit 1?
11      DR. CONLEY:        I have.
12      MR. PATE:        All right.  Did that refresh your
13  memory somewhat?
14      DR. CONLEY:        Yes, and it's consistent with my
15  memory.
16      MR. PATE:        And what is your memory of, in what
17  manner x-rays would, I guess, those would have been Dr. Lapkass?
18      DR. CONLEY:        This basically indicates that x-rays
19  were taken before, when the patient was admitted to include
20  pelvis and right hip, and left forearm.  And x-rays were taken
21  the next day on 12/5, and the x-rays from 12/4 and 12/5 were
22  sent to Dr. Lapkass by Teleradiology.  In other words, they were
23  in-coded and sent by wire.
24      MR. PATE:        Right.  And those, did you learn about
25                          -32-

1  the broken hip in this way?

2      DR. CONLEY:        No, I already knew this before.

3      MR. PATE:          Okay.  Did you learn that Mrs. James

4  also suffered a fracture at the base of her neck?

5      DR. CONLEY:        Doesn't say it here.

6      MR. COOPER:        Objection, and I object that the, mis-

7  states the record before you, counsel.  The sentence says x-rays

8  of the right hip were repeated today and now show a nondisplaced

9  or very minimally displaced fracture at the base of the neck.

10  That's the sentence to which you refer, right counsel?

11      MR. PATE:          Yes, sir.

12      MR. COOPER:        Doesn't say her neck, does it?

13      MR. PATE:          I thought so, it says very minimally

14  displaced fracture at the base of her neck.

15      MR. COOPER:        It says of the neck, I'm referring to

16  it right there.

17      DR. CONLEY:        The neck of the femur.

18      MR. PATE:          All right.  I apologize, is that your

19  understanding?

20      DR. CONLEY:        Yes.

21      MR. PATE:          Not of the neck.

22      DR. CONLEY:        No.

23      MR. PATE:          I'm sorry, excuse me.  Not of her neck,

24  of the neck of the femur is it.

25                              -33-

1    DR. CONLEY:          The neck of the femur, yes.

2    MR. PATE:            Okay.

3    MR. COOPER:          Just so we can be really clear.  When

4    it says here, doctor, base of the neck, you are not referring,

5    Dr. Lapkass is not referring to the cervical spine.  Is that

6    correct?

7    DR. CONLEY:          That's correct.

8    MR. COOPER:          Okay, thank you.

9    DR. CONLEY:          He's referring to the neck of the

10   femur.

11   MR. COOPER:          Thank you, counsel for all my

12   interruptions.

13   MR. PATE:            Fine.  Oh, Dr. Conley, … .

14   DR. CONLEY:          Um hum.

15   MR. PATE:            … to the best of your knowledge do you

16   know what a Patient Care Plan is?

17   DR. CONLEY:          It can be used in a number of different

18   contexts.  It's used generally speaking, compilation of those

19   things that you are planning to do to bring the patient back to

20   health, and or improve the patient's condition.

21   MR. PATE:            Okay.

22   DR. CONLEY:          It can also be and is frequently used

23   to mean a long term plan for such things as a nursing home,

24   place that … .

25                                -34-

1    MR. PATE:          Can I take just one second, Dr. Conley

2  and counsel?

3    COURT REPORTER:    Off record.

4    COURT REPORTER:    Back on record.

5    MR. PATE:          How about in the red with the Patient

6  Care Plan in relation to, I guess, assessment for potential

7  injury, assessment of potential for injury.  Is that, anything

8  different about that to you?

9    DR. CONLEY:        I'm confused as to what you are asking.

10   MR. PATE:          Well … .

11   DR. CONLEY:        Are we still on the x-rays?

12   MR. PATE:          No, doctor, sorry, I apologize for not

13 clarifying that.  Trying to pry you back into the hospital rule

14 area.

15   DR. CONLEY:        Okay.

16   MR. PATE:          So I'm asking about, you gave me a

17 general response back about what a Patient Care Plan is.

18   DR. CONLEY:        Um hum.

19   MR. PATE:          And I'm saying okay, thank you.  And

20 now how about Patient Care Plan in relation to an assessment for

21 what patient, a potential for injury.  Does it have any special

22 meaning, a Patient Care Plan to you?

23   DR. CONLEY:        Generally speaking, those are nursing

24 care plans rather than physician care plans.  And generally

25                              -35-

1  speaking, that sort of thing is addressed when the nurses come

2  up with a Nursing Care Plan for the patient.

3      MR. PATE:          Okay.  So promptly is that done or is

4  it supposed to be done?

5      DR. CONLEY:        Excuse me, that is something that's

6  done within the first day of the patient's admission when the

7  nursing staff assesses the patient.  I abnormally, it should be

8  done within a couple of hours of admission.

9      MR. PATE:          Couple hours.  And what is the, I

10 guess, you visited Mrs. James in the emergency room and then saw

11 her again later on before she had the fall from bed.  Is there

12 any other that between you and the nurse, or nurses who, I

13 guess, eventually tracked this patient care plan?

14     DR. CONLEY:        Yes, and I, you know, go over with the

15 nursing staff, the basics of the admission, why the patient is

16 being admitted, what one is expecting to do, etc.

17     MR. PATE:          Is this done face to face, or over the

18 phone, or by E-mail, or does it vary?

19     DR. CONLEY:        It varies with how busy things are.

20 Frequently it is face to face, sometimes it's written, sometimes

21 it's done a little bit after the fact because things are too

22 busy to do it at once.

23     MR. PATE:          Do you remember that process in

24 interaction with the nursing staff in relation to Mrs. James

25                        -36-

1   when that occurred with her, with admitting her?

2       DR. CONLEY:           I don't know, I, no, I don't.

3       MR. PATE:            All right.  When you do that conferring

4   with the staff, is that noted or are notations made or written

5   records made of that?

6       DR. CONLEY:           Not necessarily and probably typically

7   not.

8       MR. PATE:            Um, does the Patient Care Plan, is it,

9   eventually when it's manifested is it in the written form?

10      DR. CONLEY:           Yes, there is a Nursing Care Plan in

11  it.

12      MR. PATE:            Does it have a particular format, does

13  it say like Nursing Care Plan across the top of it or … ?

14      DR. CONLEY:           Yes, they have a form that they use.

15      MR. PATE:            Um, I guess I'd ask you to, not saying

16  that I have it in the 22 pages I provided you, but I ask you

17  just to take a second to page through to see if you recognize it

18  in any of these documents I have.

19      DR. CONLEY:           Yeah, it is to some extent on page 17

20  of 22.

21      MR. PATE:            Page 17 of 22.

22      DR. CONLEY:           Oh, it would be 16 and 17.

23      MR. PATE:            And for the record that is HHS-800 and

24  801.

25                          -37-

1    DR. CONLEY:          Yes.

2    MR. COOPER:          I'd ask the doctor to continue to page

3    on through before he answers.

4    DR. CONLEY:          Oh yeah, it's the HO in 19 and 20, 21;

5    16 through 21.

6    MR. PATE:            Can you tell when this assessment was

7    done?

8    DR. CONLEY:          I, I would say that almost surely it

9    was done after the patient fell out of bed.  For one thing it is

10   dated 12/5, and for another it talks about a posey restraint,

11   there is more than one observation.

12   MR. PATE:            Doctor, I would ask you to turn to page

13   16.

14   DR. CONLEY:          Okay.

15   MR. PATE:            I believe that's the first page you

16   just gave me.

17   DR. CONLEY:          Um hum.

18   MR. PATE:            And look at the top line and tell me if

19   that's consistent with what you said?

20   DR. CONLEY:          The first page appears to have been

21   filled out, well it is or it isn't.  It says admission time

22   12/4/00 and 1700.  Time of assessment 1700.  Yeah, I'm not sure,

23   I guess you could argue that it was done on 12/4.

24   MR. PATE:            So it's not clear yet?

25                             -38-

1    DR. CONLEY:          Yes.

2    MR. PATE:            Okay.

3    DR. CONLEY:          It isn't clear because on the last

4  page, the date of admit is 12/5.

5    MR. PATE:            Dr. Conley, can you tell me what, and

6  I'm going to mispronounce this, iatrogenic, that's I A T R O G E

7  N I C, what that word means?

8    DR. CONLEY:          Iatrogenic means physician caused, I

9  guess it is.  If I give you penicillin and I know that you are

10  allergic to penicillin, that injury is psychiatric-tonic,

11  physician policy we found.

12    MR. PATE:            Doctor, I'm handing you what's been

13  marked as Plaintiff's Exhibit 2 to madam clerk and Mr. Cooper.

14    DR. CONLEY:          Okay.

15    MR. PATE:            Do you want to just, I mean consistent

16  with what Mr. Cooper has been having you do, if you would like

17  to take a few seconds just to look at it.  And it is five pages,

18  just take a second to look at it.  And we will go off record so

19  I don't do it on … .

20    COURT REPORTER:      Off record.

21    COURT REPORTER:      Back on record.

22    MR. PATE:            So Dr. Conley, I'd asked you what the

23  meaning of the word iatrogenic is.  And you told us that it

24  meant physician caused.

25                              -39-

1    DR. CONLEY:          Right.

2    MR. PATE:            And I'd ask you to look at Exhibit 2

3  and specifically I'll ask you to turn to page 3 … .

4    DR. CONLEY:          Right.

5    MR. PATE:            … of Exhibit 3, that's HHS-579.

6    DR. CONLEY:          Um hum.

7    MR. PATE:            And under Past Medical History, could

8  you read to us what it's, read us the first note.

9    DR. CONLEY:          Yes, Past Medical History number 1.

10 Status post iatrogenic fracture of the right hip in December of

11 2000.

12   MR. PATE:            So explain to us what you think that

13 means given the definition that you told us prior to here?

14   DR. CONLEY:          I think it's a term that's used

15 incorrectly which is quite possible that what was dictated was

16 introchanteric and it was typed up as iatrogenic.  The other

17 possibility is that it was misused, if indeed it was an

18 iatrogenic fracture, it would indicate that a physician

19 purposely broke the patient's hip.

20   MR. PATE:            It doesn't necessarily mean purposely,

21 does it?

22   DR. CONLEY:          Well, okay.

23   MR. PATE:            It could be inadvertent, couldn't it?

24   DR. CONLEY:          Attentive.

25                          -40-

1   MR. PATE:          It doesn't take … .

2   MR. COOPER:        I ascertain that it doesn't imply

3   malice, does it necessarily?

4   MR. PATE:          No, no, it doesn't.

5   MR. COOPER:        Okay.

6   MR. PATE:          And so is there also a possibility that

7   Dr. Bruhl, although it will be a different opinion of you, that

8   this was an inadvertently caused hip fracture by the hospital.

9   Is that correct?  That is a possibility isn't it?

10  DR. CONLEY:        It would be stretching quite a bit but

11  I suppose it's possible.

12  MR. PATE:          Um, doctor, almost done, if you just

13  give me a second … .

14  DR. CONLEY:        Sure.

15  MR. PATE:          … maybe go off record.  I'm just going

16  to find who … .

17  COURT REPORTER:    Off record.

18  COURT REPORTER:    Back on record.

19  MR. PATE:          Dr. Conley, for counsel's, I guess,

20  purpose, if there is going to be an injection, but I don't see

21  it.  It needs to be, I'm going to ask you questions about the

22  relation between broken hip of an elderly person … .

23  DR. CONLEY:        Um hum.

24  MR. PATE:          … and I guess, hastening death or

25                          -41-

1  increasing the risk of death.  Do you have any, based on your

2  training experience, do you have any knowledge as to that?

3       DR. CONLEY:         I think it's a generally part of the

4  common risk of people who break their hips, have some tendency

5  to decline in the physical sense.  There is relatively little

6  evidence that that's necessarily true.  It's one of those sort

7  of common wisdom pieces of information.

8       MR. PATE:           Um hum.  Have you ever heard of any

9  studies that put a percentage on the number of hip fracture

10  patients over a certain age who die within a year?

11       DR. CONLEY:         No, I'm not familiar, most of my

12  readings are in pediatrics.

13       MR. PATE:           So many studies, which do you show

14  this?

15       DR. CONLEY:         There, there could well be, right.

16       MR. PATE:           Um, I don't have any further questions.

17       MR. COOPER:         Thank you, I have a few I believe.

18  Doctor, so for the purpose of the record, my name is Daniel

19  Cooper and I'm Assistant U.S. Attorney.  I represent the United

20  States Government, SEARHC, the hospital, all the Defendants in

21  this case.  What was the first time you and I met, Doctor?

22       DR. CONLEY:         Yesterday about 1:00 I think.

23       MR. COOPER:         And at that time did I show you any

24  documents?

25                              -42-

1   DR. CONLEY:           On the ... .

2   MR. COOPER:           Did I show you a Discharge Summary, a

3   Discharge Summary?

4   DR. CONLEY:           Yes, I believe so.

5   MR. COOPER:           Okay, other than that, did I show you

6   any documents?

7   DR. CONLEY:           No other documents.

8   MR. COOPER:           Okay.  Um, besides those documents have

9   you had an occasion to recently review the chart of Sarah James

10  in its entirety?

11  DR. CONLEY:           I looked at the Admission from December

12  of 2000, 2000.  I leafed through it sometime last week, I

13  believe on Friday.

14  MR. COOPER:           Did, did you read it in detail?

15  DR. CONLEY:           Yeah, um hum, I did.

16  MR. COOPER:           Did you review it to the extent that it

17  was a review of the chart at that time refresh your recollection

18  about Mrs. James's course of care in the hospital from December

19  4th to December 18th of 2000?

20  DR. CONLEY:           It did.

21  MR. COOPER:           You've had a case before you, and I

22  hate to do this but I think I'm going to.

23  DR. CONLEY:           Um.

24  MR. COOPER:           Plaintiff's Exhibit number 1, do you

25                              -43-

1  have that document in front of you now, Doctor?

2      DR. CONLEY:        Okay.

3      MR. COOPER:        I want to go through it kind of page by

4  page to identify. Do you know who prepared page one of the

5  document?

6      DR. CONLEY:        Medical Records would have prepared

7  this.

8      MR. COOPER:        How about page two, is that your

9  signature at the top?

10     DR. CONLEY:        That's my signature.

11     MR. COOPER:        And what was the purpose of your

12 signature there, sir?

13     DR. CONLEY:        It's a say sheet indicating that I

14 agree with the diagnosis on the Discharge Summary.

15     MR. COOPER:        Okay.  When you say the diagnosis,

16 that's … .

17     DR. CONLEY:        These.

18     MR. COOPER:        We find that they are in blocks 26, 27,

19 and 28 on the first page.

20     DR. CONLEY:        That's correct.

21     MR. COOPER:        Okay.  All right, the third page which

22 is page 3 of 22 or HHS-775 … .

23     DR. CONLEY:        Um hum.

24     MR. COOPER:        … do you recognize that?

25                        -44-

1    DR. CONLEY:          That's a so-called BCM, It's a chart,

2  or I'm sorry, a page slip prepared by the billing office to keep

3  track of costs.

4    MR. COOPER:          Did you have anything to do with that?

5    DR. CONLEY:          No, nothing.

6    MR. COOPER:          The next page 4 of 22.

7    DR. CONLEY:          That's an Advance Directive Flowsheet

8  that the nurses fill out asking a patient to reference to date,

9  you know, things like resuscitation, organ donations, things on

10  those lines.

11    MR. COOPER:          Okay, but you didn't have anything to

12  do with the preparation of that, I ask you now.

13    DR. CONLEY:          No, I didn't.

14    MR. COOPER:          Okay.  Page 5 of 22 and 6 of 22, are

15  your Discharge Summary, is that correct?

16    DR. CONLEY:          That's correct.

17    MR. COOPER:          And that's dictated by you, signed by

18  you, and your, well let's see, there are some handwritten notes

19  on page 6 of 22.  Do you recognize that writing?

20    DR. CONLEY:          That's Elliott from one of the Family

21  Practitioners.

22    MR. COOPER:          Okay.  Then the next page, page 7, it

23  says Discharge Summary Addendum, did you prepare that?

24    DR. CONLEY:          I did.

25                          -45-

1    MR. COOPER:         Okay.  Then page 8 and 9 of Exhibit 1,
2  did you prepare those?

3    DR. CONLEY:         That's my dictation.

4    MR. COOPER:         All right.  Next, now, now let's talk
5  about that for a minute.  History and Physical Examination
6  Report, you dictate this after you take the history and get the
7  past history, and social history of the patient, is that
8  correct?

9    DR. CONLEY:         That's correct.

10   MR. COOPER:         In the case of Sarah James, Mrs. James,
11 on December 4, 2000, when she was, when you saw her in the
12 emergency room, was she able to clearly give you this history?

13   DR. CONLEY:         Some of the history was from Mrs.
14 James, some of the history was from the chart, some of the
15 history was from her relatives.

16   MR. COOPER:         Were they present in the emergency
17 room?

18   DR. CONLEY:         That's correct.

19   MR. COOPER:         Okay.  How agitated was she when she
20 first came in?

21   DR. CONLEY:         She was pretty agitated when she first
22 came in. She was crying in pain, she was somewhat frightened,
23 and she was agitated I guess would be the best way to describe
24 it.  She calmed down while she was in the emergency room.

25                              -46-

1    MR. COOPER:        Okay.  Now on page 9 of 22 which is the

2  last page of your History and Physical Examination Report.  The

3  last heading at the bottom of that page says Plan, do you see

4  that?

5    DR. CONLEY:        Yes.

6    MR. COOPER:        Is that where the physician kind of

7  based upon the history that's just been taken, physical exam has

8  just been taken, kind of gives the fundamental sketch of what

9  the plan for the course of treatment is for that patient in this

10  hospital stay?

11    DR. CONLEY:        Yes, and that would be the case.

12    MR. COOPER:        Okay.  And what is this, what was your

13  plan at the time she was admitted on December 4th of 2000?

14    DR. CONLEY:        Well the plan was that it looked like

15  everything was okay.  She had been evaluated extensively with x-

16  rays and physical examination.  She seemed stable.  The family

17  seemed to be fairly upset and so it was decided to keep the

18  patient in the hospital overnight to make sure that things

19  calmed down and that there weren't any further problems.

20    MR. COOPER:        And … .

21    DR. CONLEY:        And it was planned to send her home the

22  next day and all that failed.

23    MR. COOPER:        Do you recall who was present with her?

24    DR. CONLEY:        I don't.

25                                    -47-

1    MR. COOPER:          Okay.  Okay, the next page says, marked

2  page 10 of 22, do you know what that is?

3    DR. CONLEY:          Nutrition Assessment.

4    MR. COOPER:          Did you have anything to do with that?

5    DR. CONLEY:          No.

6    MR. COOPER:          Who prepares Nutrition Assessment?

7    DR. CONLEY:          The Nutritionist.

8    MR. COOPER:          You would review the Nutrition

9  Assessment in the course of your treatment.

10    DR. CONLEY:          Right.

11    MR. COOPER:          But somebody else actually prepares it?

12    DR. CONLEY:          Yes.

13    MR. COOPER:          Okay.  The next page 11 of 22, that's

14  the Dr. Lapkass's consultation.

15    DR. CONLEY:          Right.

16    MR. COOPER:          Would you have received this

17  consultation by a fax or other transmission from Dr. Lapkass in

18  Anchorage for you to review?

19    DR. CONLEY:          I would of, I would say that I'm almost

20  sure that I got this sometime after the fact.  This was, the

21  information and recommendations were transmitted orally by

22  phone.

23    MR. COOPER:          Okay.

24    DR. CONLEY:          And this usually doesn't show up until

25                                  -48-

1  several days later.

2       MR. COOPER:          Now and just so we are perfectly clear

3  when, here where Dr. Lapkass is referring to a displaced

4  fracture at the base of the neck, he's talking about the neck of

5  the femur which you've previously described.

6       DR. CONLEY:          That's correct.  That's what

7  intratrumpinteric means.

8       MR. COOPER:          Thank heavens you doctors can say words

9  like that.  I turn your attention next doctor, to page 12 of 22,

10  do you see that?

11      DR. CONLEY:          Yes, I do.

12      MR. COOPER:          Okay.  Those are your original doctor's

13  orders entered on December 4, of 2000, at approximately 1600,

14  correct?

15      DR. CONLEY:          That's correct.

16      MR. COOPER:          And then there is also a notation, see

17  it says noted M. Hausand, RN 12/4/00 1730.  Do you know whose

18  handwriting that would be?

19      DR. CONLEY:          A nurse by the name of M. Hausand.

20      MR. COOPER:          And is that the standard practice in

21  December of 2000, that the physician would write the orders and

22  the RN that signed it before would read those orders and then

23  make such a note as defined here in this case?

24      DR. CONLEY:          That's correct.

25                            -49-

1    MR. COOPER:        Is that one of the ways that you

2  transmit information, background information to the nursing

3  staff for their Nursing Care Plan?

4    DR. CONLEY:        That's correct.

5    MR. COOPER:        All right, thanks.  I'm going to turn

6  your attention next to page 13 of 22, Doctor.  And once again,

7  it is caption at the head, Doctor's Orders.  Do you recognize

8  this document?

9    DR. CONLEY:        I do.

10    MR. COOPER:        And does your signature appear on here?

11    DR. CONLEY:        It does in several places, only in two

12  places.

13    MR. COOPER:        Okay, let's turn your attention first

14  to the very top entry.  Do you see where it says 12/4 of 2000,

15  an entry at 1905?

16    DR. CONLEY:        Okay.

17    MR. COOPER:        Is that an entry you made?

18    DR. CONLEY:        That's correct.

19    MR. COOPER:        What is, what is entry number one?

20    DR. CONLEY:        1 on 1.

21    MR. COOPER:        What is 1 on 1?

22    DR. CONLEY:        It means that somebody needs to stay in

23  the room with the patient on a continuous basis.

24    MR. COOPER:        Number two.

25                          -50-

1    DR. CONLEY:            It means that the patient should be

2  placed in a posey restraint.

3      MR. COOPER:           Okay.  And number three.

4      DR. CONLEY:           Ah, that, at that point the patient

5  needs something for agitation, mainly some Holdal.

6      MR. COOPER:           Okay.  And in between the one

7  appearance on 1 on 1, and two appearance in posey, and three

8  appearance, Holdal, half milligram or whatever; there is a check

9  mark, do you see those check marks?

10     DR. CONLEY:           Yes.

11     MR. COOPER:           Did you put those check marks there?

12     DR. CONLEY:           I really don't know if I did or not.

13     MR. COOPER:           Okay.  Was that, would that be

14 typically where a nurse would check off as she read it, to say I

15 read it and then note it somewhere down below?

16     DR. CONLEY:           I really don't know.

17     MR. COOPER:           You don't, okay.  Now the following

18 page, 14 of 22, what page is that?

19     DR. CONLEY:           14.

20     MR. COOPER:           Um hum.

21     DR. CONLEY:           Okay, I've got it.

22     MR. COOPER:           Are those once again doctor's orders

23 that you wrote?

24     DR. CONLEY:           They are.

25                            -51-

1      MR. COOPER:          Okay.  15 of 22.

2      DR. CONLEY:          Yes.

3      MR. COOPER:          Are those doctor's orders that you

4  wrote once again?

5      DR. CONLEY:          They are.

6      MR. COOPER:          Now 16 of 22 to 19 of 22, those four

7  pages, do you recognize that, those four pages, Doctor, there is

8  a nursing assessment done by the nursing staff.

9      DR. CONLEY:          I do.

10     MR. COOPER:          So that's really a nursing assessment,

11 is it not?

12     DR. CONLEY:          That's correct.

13     MR. COOPER:          To the best of your knowledge, Doctor,

14 is this where a nurse sits down with a patient, or whoever else

15 might be present, and goes through and makes an attempt to

16 assess the nurse's bit, excuse me, the nature of the patient's,

17 then state with respect to each of these areas?

18     DR. CONLEY:          That's correct.

19     MR. COOPER:          Okay.  And at the bottom it's called a

20 Nursing Admissions Data Base Interdisciplinary Adult Patient

21 Information form.  Do you see that?

22     DR. CONLEY:          I see it.

23     MR. COOPER:          Do you know if this information from

24 this assessment is actually ever entered into an electronic

25                                -52-

1  data base or is that just kept on their chart?

2       DR. CONLEY:        No, I think it's kept on the chart.

3       MR. COOPER:        Okay.  Now did you have anything to do

4  with the preparation 16 through 19 of Exhibit 1?

5       DR. CONLEY:        No.

6       MR. COOPER:        Okay.  Now turning your attention,

7  please to page 20 and 21.

8       DR. CONLEY:        20 and 21, um hum.

9       MR. COOPER:        Okay.  Now here, do you recognize these

10 two pages, there's front and back, of a Nursing Plan or Patient

11 Care Plan for patients who have suffered a fracture that was

12 being used by the hospital in December of 2000?

13      DR. CONLEY:        Yes, I do.

14      MR. COOPER:        So eventually, is my understanding

15 correct, Doctor that the nursing staff has prepared a number of

16 forms … .

17      DR. CONLEY:        Um hum.

18      MR. COOPER:        … for Patient Care Plans?  And they

19 have one for fractures, and they have one for post-op, and one

20 for alcohol detox and so forth, a variety of them.  And so that

21 they will have typed in a portion of the plan and then leave

22 room for the nursing staff to write in any additional

23 information.  Is my understanding correct?

24      DR. CONLEY:        That's correct.

25                              -53-

1    MR. COOPER:          Okay.  So this is a fracture care plan.

2    DR. CONLEY:          Correct.

3    MR. COOPER:          And it would have been become part of

4    the patient's chart after the fracture of her hip was identified

5    on December 5th, is that correct?

6    DR. CONLEY:          That's correct.

7    MR. COOPER:          Okay.  Now then finally we get to the

8    last page of 22 … . (Tape turned over).

9    COURT REPORTER:      Okay.

10   MR. COOPER:          Okay.  Doctor, the pending question is

11   on page 22 of 22, does your handwriting take place anywhere on

12   there at all?

13   DR. CONLEY:          Yes, the second note.

14   MR. COOPER:          And what is, that's the note dated 12/4

15   at 1900?

16   DR. CONLEY:          That's correct.

17   MR. COOPER:          Um, could the note that says 12/4/00 at

18   1930, is that your note at all?

19   DR. CONLEY:          That is not my note.

20   MR. COOPER:          Do you remember a nurse named Kenneth

21   Sam?

22   DR. CONLEY:          Yes, I do.

23   MR. COOPER:          Was Kenneth Sam employed by the

24   hospital to the best of your recollection in December of 2000?

25                              -54-

1    DR. CONLEY:         Yes, he was employed by the hospital, I

2    couldn't, couldn't state any direct knowledge of the dates, but

3    yes.

4        MR. COOPER:         Do you think, do you have any reason to

5    believe that this note, 12/4/00 at 1930, was written by Kenneth

6    Sam?

7        DR. CONLEY:         I believe it was, yes.

8        MR. COOPER:         Okay.  And that's based upon his

9    signature?

10       DR. CONLEY:         Yes, well, yes based on his signature.

11       MR. COOPER:         Do you recall your seeing him present

12   in the hospital or in Mrs. Sarah James's room on the night of

13   December 4th?

14       DR. CONLEY:         I don't have no independent knowledge

15   on that.

16       MR. PATE:          Just a minute please, counsel.

17       MR. COOPER:         Doctor, you talked about sundowning.

18   Sundowning has a variety of manifications, does it not?

19       DR. CONLEY:         Yes.

20       MR. COOPER:         For instance, some patients when they

21   "sundown" they become very withdrawn and very low, almost

22   approaching the state of being catatonic, is that right?

23       DR. CONLEY:         They withdraw, they are very silent and

24   reserved, yes.

25                              -55-

1    MR. COOPER:          And other patients, however, become

2  quite agitated, very mobile, noisy, loud, and the like; is that

3  right?

4    DR. CONLEY:          That's correct.  I think the most

5  significant characteristic is that both of them have sleep

6  problems.

7    MR. COOPER:          So it's really a sleep disruption

8  pattern that is noted, right?

9    DR. CONLEY:          Yes, um hum.

10    MR. COOPER:          Okay.  Now how long have you been a

11  physician, sir?

12    DR. CONLEY:          Thirty-seven years.

13    MR. COOPER:          Okay.  Where did you take your medical

14  degree?

15    DR. CONLEY:          University of Chicago.

16    MR. COOPER:          And where did you do your residency?

17    DR. CONLEY:          The mid-internship would be the

18  University of Washington, and the pediatric was at the

19  University of New Mexico, in Albuquerque.

20    DR. COOPER:          In that thirty-seven years of

21  experience have patients managed to find their way out of

22  restraints?

23    DR. CONLEY:          Yes, they have, that's not unusual.

24    MR. COOPER:          Okay.  Let me just, let me just take

25                          -56-

1  this whole concept of restraints, have you ever experienced

2  patients getting out of leather cuff restraints?

3       DR. CONLEY:          Yes, I have.

4       MR. COOPER:          How about soft wrist restraints?

5       DR. CONLEY:          Yes.

6       MR. COOPER:          A posey vest?

7       DR. CONLEY:          Yes.

8       MR. COOPER:          Um, bed rails?

9       DR. CONLEY:          Yes, I've seen people crawl over bed

10 rails.

11      MR. COOPER:          Bed alarms?

12      DR. CONLEY:          Bed alarms, yes in a, I have.  Some

13 psychiatric patients figure out a way to disable them.

14      MR. COOPER:          And so they can defeat the bed alarm

15 and get out of bed without the … .

16      DR. CONLEY:          Without any help.

17      MR. COPER:           Okay.  Is it your experience as a

18 physician of thirty-seven years that if a patient decides they

19 are going to defeat any types of restraints that they may be

20 able to do so?

21      DR. CONLEY:          Certainly up to the level of leathers I

22 would say so.

23      MR. COOPER:          Okay. Other than Houdini, have you ever

24 heard of anybody getting out of a straight jacket?

25                              -57-

1    DR. CONLEY:        Ah, no, I don't think so.

2    MR. COOPER:        Could he, could he ever do it by

3    dislocating his shoulder, right?

4    DR. CONLEY:        Shoulders.

5    MR. COOPER:        Okay.

6    DR. CONLEY:        Right.

7    MR. COOPER:        Okay, I have no further questions for

8    this witness at this time.  Thank you.

9    MR. PATE:          I should follow (unintelligible)

10   practice and identify myself for the record.  I apologize I

11   didn't do that.  I'm Michael Jude Pate, I question the unit,

12   attorney for Mary Miller.  Dr. Conley, on page 13 of 22 … .

13   DR. CONLEY:        13.

14   MR. PATE:          That's HHS-785.

15   DR. CONLEY:        Yes, um hum.

16   MR. PATE:          Mr. Cooper walked you through, I guess,

17   where it has notations in your handwriting 1 on 1, posey, and

18   Holdol.

19   DR. CONLEY:        Yes.

20   MR. PATE:          This was entered before or after the

21   time that Mrs. James fell out of bed and broke her hip?

22   DR. CONLEY:        Ah, I'm sure it is after.

23   MR. PATE:          Okay.  Um, could we go off record for

24   just a second?

25                               -58-

```
1        COURT REPORTER:      Off record.

2        COURT REPORTER:      Back on record.

3        MR. PATE:            Dr. Conley, anything you want to add

4   about whether the notations about where one, oh, just wait a

5   second.  Dr. Conley, anything you want to add about page

6   fourteen of Exhibit one, the notations made December 4 about 1

7   on 1, posey, and Haldol.  And you, I believe you indicated that

8   those, this was entered after Mrs. James fell from bed and broke

9   her hip, is that correct?

10       DR. CONLEY:          Well I assume it was based on the fact

11  that it's noted that it's 1905 as the time.  And the noted time

12  of falling out of bed is 1830.  Otherwise I wouldn't of, that

13  the 1905 of the digits 1905 are not in my handwriting.

14       MR. PATE:            Okay.

15       DR. CONLEY:          The 12/4/00 and the 1, 2. 3. of the

16  orders are all in my handwriting but the time is not in my

17  handwriting.

18       MR. PATE:            Well could you of ordered more than one

19  continuous observation and it wasn't followed then?

20       DR. CONLEY:          Oh, I suppose, it's you know, one could

21  argue that, it seems highly unlikely.

22       MR. PATE:            Okay.  Um, you referenced a fall out of

23  bed at 1830, is that correct?

24       DR. CONLEY:          Coming from the nurse's minutes it's,

25                              -59-
```

1  where did I see it.  Um, okay … .

2        MR. PATE:            Is that page 22?

3        DR. CONLEY:          22, I noted something, yes, um hum.

4        MR. PATE:            Okay.  Is that when you believed that,

5  is that your, to the best of your knowledge, I guess, accurate?

6        DR. CONLEY:          As far as I can tell it's accurate.

7  It's in Ken Sam's name and that it indicates patient crawled

8  over rail at 1830 and fell to floor.

9        MR. PATE:            Do you know if Ken Sam still works at

10  SEARHC?

11        DR. CONLEY:          No, he does not as far as I know.

12        MR. PATE:            On pages 16 to 19 of Exhibit 1, that's

13  … .

14        DR. CONLEY:          Um hum.

15        MR. PATE:            … pages HHS-800 to 803.

16        DR. CONLEY:          Um hum.

17        MR. PATE:            I think you told Mr. Cooper that you

18  didn't have anything to do with, I guess, these, the creation of

19  this document, is that correct?

20        DR. CONLEY:          That's correct.

21        MR. PATE:            Wasn't this information based upon

22  information you took in the emergency room?  Isn't some of this

23  information supplied by you?

24        DR. CONLEY:          It's quite possible that some of the

25                              -60-

1  information was distracted from my notes, but I couldn't tell

2  you specifically what parts of it they were arrived at

3  independently by the nursing staff, and what parts of it were

4  copied from my notes.

5      MR. PATE:          So did you meet with Mr. Sam, I guess

6  before he drafted this up?

7      DR. CONLEY:          I couldn't tell you but I have no

8  independent knowledge on that, or recollection, I'd say.

9      MR. PATE:          Okay.  You told Mr. Cooper that, you

10  referred to Houdini, or I'm not sure if you actually said that

11  but you said that you've seen patients get out of all sorts of

12  restraints.

13      DR. CONLEY:          Um hum.

14      MR. PATE:          Is that any reason that the hospital

15  should, I guess, do away with restraints or not have any

16  restraints?

17      DR CONLEY:          No.

18      MR. PATE:          Are restraints effective?

19      DR. CONLEY:          Restraints can be effective by,

20  depending on the situation.  They are an intent to, you know,

21  insure safety.  They are not completely effective.

22      MR. PATE:          They are not a certainty?

23      DR. CONLEY:          They are not, sir.

24      MR. PATE:          But do they increase the chance of a,

25                              -61-

1  I guess, a safe care and stay for the patient at the hospital?

2      DR. CONLEY:          Ah, not necessarily and I would, the

3  implication of where you are going with this is not something

4  that would be agreed to by medical personnel and the general

5  feelings about when you use restraints.

6      MR. PATE:          Well what about bed rest, is that a

7  form of restraint?

8      DR. CONLEY:          That is a form of restraint.

9      MR. PATE:          So I guess the bed rails increase

10  patients safety.

11     DR. CONLEY:          Ah, they act as a deterrent to patient

12  getting out of bed and it's a reminder that they are to stay in

13  bed.  And so they probably undoubtedly increase safety.

14     MR. PATE:          How about the bed alarm.

15     DR. CONLEY:          The bed alarm is a useful tool for

16  alerting the nursing staff when somebody is starting to wander

17  and is used quite frequently.  We frequently put people in

18  chairs high in the traditional care, nursing home sort of, part

19  of the hospital which then it was.  But it will be open again in

20  a couple of weeks.  Well, no what it does, you can't possibly

21  spend your time watching every individual patient twenty-four

22  hours.  They, it will alert you when a patient is under away, in

23  motion.  And that alerts you to look at the patient.

24     MR. PATE:          Is there a downside to bed alarms as

25                                   -62-

1  far as patient safety goes?

2      DR. CONLEY:          Not unless you wrapped it around your

3  neck and strangled yourself.  I can't imagine why.

4      MR. PATE:            So on the balance, bed alarms increase

5  patient safety?

6      DR. CONLEY:          They appear to increase patient safety.

7      MR. PATE:            How about poseyness?

8      DR. CONLEY:          That would be … .

9      MR. COOPER:          That was already asked about

10  (unintelligible).

11      MR. PATE:            Right, um hum.

12      MR. COOPER:          Okay.

13      DR. CONLEY:          I've seen them be useful and increase

14  safety and I've seen them be a potential danger.  I've seen

15  people who have managed to crawl out of bed with a posey on and

16  become hanging from the bed by the posey.

17      MR. PATE:            Did that happen when a posey is

18  properly strapped and … .

19      DR. CONLEY:          Oh, yes, um hum.

20      MR. PATE:            So on the balance does a posey provide

21  increased safety or do you indicate it (unintelligible)?

22      DR. CONLEY:          Probably it increases safety on

23  balance.

24      MR. PATE:            I don't have any further questions for

25                          -63-

1  Dr. Conley.

2       MR. COOPER:          Dr. Conley, I'm going to take you back

3  through this one more time on page 13 of 22.

4       DR. CONLEY:          Okay, page 13 of 22, okay.

5       MR. COOPER:          It says Doctor's Orders at the top of

6  the page 12/4/2000.  One l on l, two posey, three Haldol half a

7  milligram something.  Those are your orders, right?

8       DR. CONLEY:          Yes.

9       MR. COOPER:          Did you order those before or after

10 Mrs. James fell from her bed?

11      DR. CONLEY:          After.

12      MR. COOPER:          I'm sorry, the answer is.

13      DR. CONLEY:          After she fell from her bed.

14      MR. COOPER:          Right.  Thank you, I have no further

15 questions.

16      MR. PATE:            No further questions.

17      COURT REPORTER:      Off the record.

18                           END OF RECORD

19                           _____

20                           DR. THOMAS CONLEY

21 STATE OF ALASKA              )

22 FIRST JUDICIAL DISTRICT  ) ss:

23      I, CLAUDIA FAYE DONNALLY, a Notary Public in and for the

24 State of Alaska, do hereby certify:

25                           -64-

1  That pursuant to Notice of Deposition of DR. THOMAS CONLEY,
2  there came before me on the 27th day of September, 2005,
3  beginning at 1:30 p.m., of said day, the following person to-
4  wit: DR. THOMAS CONLEY.  That the above deposition of said
5  witness was reported through the use of a Dictaphone, and
6  thereafter transcribed into typewritten form.

7  I further certify that the said witness read and signed his
8  deposition.

9  I further certify that the above-named witness was before
10 examination by me duly sworn to testify the truth, the whole
11 truth and nothing but the truth, so help him God.

12 I further certify that the following is a true and correct
13 transcript of the proceedings and in the above-mentioned matter.

14 IN WITNESS WHEREOF, I have hereunto set my hand and affixed
15 my official seal this 12th day of October, 2005.

Claudia Faye Donnally

Claudia Faye Donnally

Notary Public in and for Alaska

My Commission expires: 3/28/06

-65-

October 11, 2005

Please note the following corrections I have made after Dr.
Conley read his transcript.

Page 13, line 8        Proregnata is corrected to Prorenata.
Page 13, line 14       Holdol is corrected to Haldol.

Page 14, line 14       Tarda disusa corrected to Tardive
                       Dyskenesia.

Page 17, line 14       Knocked out was corrected to
                       (unintelligible).

Page 23, line 4        Pareetal-occepetal was corrected to
                       Parietal-occipital.

Page 23, line 7        Funder normal, companic membranes
                       normal, neurology to normal corrected
                       to fundi normal/tympanic membranes
                       normal, neurologic normal.

Page 24, line 2        Bed rest corrected to bed rails.

Page 29, line 18       Next floor was corrected to next day.

Page 39, line 10       Psychiatric-tonic, physician policy we
     and line 11       found was corrected to (unintelligible)
                       (unintelligible) (unintelligible)
                       (unintelligible).

Page 49, line 7        Intratrumpinteric was corrected to
                       intertrochanteric.


Claudia Faye Donnally
Claudia Faye Donnally

1    DR. CONLEY:           Threat to wander and fall.

2    MR. PATE:             And I guess would you just continue on

3    down the lines and tell us what they read.

4    DR. CONLEY:           Diagnosis is multiple trauma.  Left

5    wrist splint.  Percoset one every six hours for pain.

6    Urinalysis on ward, CBC done in emergency room.  Ativan half a

7    milligram p.o. or i.m. of to six hours prm agitation.  Prm on

8    Prorenata means as necessary.  It means as necessary.  Regular

9    diet - no milk products.  U.S. of four while awake.  Haldol one-

10   half a milligram at bedtime.  Ambulate with supervision.

11   MR. PATE:             Okay.  So Mrs. James took Ativan in the

12   emergency room and then did you, just tell what you prescribed,

13   two Ativans I guess.  Is that it?

14   DR. CONLEY:           Pain medication and Haldol at bedtime

15   for sleep.

16   MR. PATE:             Okay.  And the pain medication, would

17   that be the Percoset?

18   DR. CONLEY:           That's right.

19   MR. PATE:             Are there any side effects that come

20   with Percoset?

21   DR. CONLEY:           Ah, constipation, it reduces pain and

22   also can reduce pulse and blood pressure to some extent.

23   MR. PATE:             Any dulling of the senses at all?

24   DR. CONLEY:           It can, yes.

25                              -13-

1    MR. COOPER:          How about Haldol, is it Haladal or

2  Haldol?

3        DR. CONLEY:          Haldol.

4        MR. COOPER:          Haldol.

5        DR. CONLEY:          Yes.

6        MR. COOPER:          What does that do?

7        DR. CONLEY:          Ah, it is used for a number of things,

8  the agitation, for, it's an anti-sycotic in small doses and a

9  half-milligram is a very small dose.  It's used for agitation

10 and helps sleep.

11       MR. PATE:       Does it have, does Haldol have any side

12 effects?

13       DR. CONLEY:          It can cause something referred to as

14 Tardive Dyskenesia which is a side effect that results in

15 strange motions of the face like that, and in some cases it

16 causes difficulty in swallowing.  Generally, speaking it's

17 something that happens after a fairly long period of time using

18 it.

19       MR. COOPER:          Just before you ask the next question,

20 counsel, for the record when the doctor said facial gestures

21 like that, he was tweaking his … .

22       DR. CONLEY:          Oh, I was … .

23       MR. COOPER:          … like his left eye in the waving kind

24 of motion.

25       MR. PATE:       Yes.

CLAUDIA'S CONFIDENTIAL
SECRETARIAL AND BOOKKEEPING SERVICE
CLAUDIA DONNALLY 105 SHULER DRIVE   *   SITKA, AK 99835   (907) 747-8091

1    DR. CONLEY:        What time are you talking about?

2    MR. PATE:          What was the next time, you wrote up

3 the order at about 4:00.

4    DR. CONLEY:        That is right.

5    MR. PATE:          The page that we just looked at, page

6 12 of Exhibit 1.

7    DR. CONLEY:        Um hum.

8    MR. PATE:          And you said that you saw her again at

9 some point later.

10    DR. CONLEY:        I couldn't tell you exactly when I saw

11 her up on the floor, up on the ward.

12    MR. PATE:          And, and what did you see up on the,

13 that she was in bed?

14    DR. CONLEY:        That she was (unintelligible), you

15 know, she was still complaining of pain.

16    MR. PATE:          Had she fallen at that point?

17    DR. CONLEY:        Yes.

18    MR. PATE:          Okay.  Do you remember anything about

19 the bed?

20    DR. CONLEY:        It had bed rails on it.

21    MR. PATE:          The bed rails were up?

22    DR. CONLEY:        Um hum.

23    MR. PATE:          Do you remember how many rails were up?

24    DR. CONLEY:        I think both rails on both sides of the

25                              -17-

1   DR. CONLEY:          That's correct.

2   MR. PATE:            And could you tell us what it says?

3   DR. CONLEY:          Fall from bed when climbed over rails.

4   Has right parietal-occipital hematoma.  (Unintelligible) on her

5   head.  Not previously seen.  Posey, etc.  Neuro unchanged.  No

6   obvious area of injury and no complaint, however again agitated

7   secondary use of the posey.  Fundi normal/tympanic membranes

8   normal, neurologie normal.

9   MR. PATE:            What's, you referenced posey, what is

10  that?

11  DR. CONLEY:          It was after she fell out of bed, the

12  posey was put on her because she had demonstrated that she was a

13  risk to fall.

14  MR. PATE:            Okay.  Um, and … .

15  MR. COOPER:          Excuse me, counselor.  Just in date of

16  your question, Doctor, he needs to know exactly what a posey is.

17  MR. PATE:            I'm sorry, I wasn't listening to it,

18  thank you.

19  DR. CONLEY:          Okay, a posey is a vest that looks

20  somewhat like a vest, such as that would be worn by somebody

21  across the heart.  And it has straps on it that go around the

22  patient and can be tied to the bed or to some other object.  It

23  leaves the patient's arms and legs free.  It's the second level

24  of restraint.

25                              -23-

1    MR. PATE:            What is the first level of restraint?

2    DR. CONLEY:          Bed rails.

3    MR. PATE:            What is the third level of restraint?

4    DR. CONLEY:          Four points soft and the restraints,

5    well two or four points soft piece restraints.

6    MR. PATE:            Okay.  So the posey is second and the

7    third is four point soft restraints?

8    DR. CONLEY:          Probably, I guess the fourth or the

9    third would be two point soft restraints.

10    MR. PATE:            And what is that?

11    DR. CONLEY:          That would be cloth binding on the

12    wrists that are tied to the bed.  And then the next step would

13    be 4.5 soft restraints which is all four extremities.  And the

14    fifth level would be leather restraints.

15    MR. PATE:            When a person is put, a patient is in a

16    posey … .

17    DR. CONLEY:          Um hum.

18    MR. PATE:            … and is properly, I guess, done … .

19    DR. CONLEY:          Um hum.

20    MR. PATE:            … can a person get out of bed?

21    DR. CONLEY:          Yes, yes, they can.

22    MR. PATE:            What does it take?

23    DR. CONLEY:          Ah, determination.

24    MR. PATE:            Does it, how great of a resistance does

25                                    -24-

1  further, it says Dr. Conley present at time of fall and helped

2  patient back into bed.  Is that accurate?

3       DR. CONLEY:          It's not accurate.  I could have been

4  right next door to help.  I do seem to remember helping her into

5  bed actually.

6       MR. PATE:          Okay.

7       DR. CONLEY:          But I was not present at the time she

8  fell.

9       MR. PATE:          Do you know if anybody saw Mrs. James

10 fall?

11      DR. CONLEY:          I don't know.  They could have seen her

12 through the window but I, there's no way to know for sure.  It

13 doesn't state specifically.

14      MR. PATE:          After the fall, did Mrs. James, did you

15 do x-rays of Mrs. James?

16      DR. CONLEY:          I went over physically and ordered some

17 x-rays on the next day.

18      MR. PATE:          Okay.  Do you remember what the results

19 of those x-rays were?

20      DR. CONLEY:          No change except that she had a

21 fracture, an intertrochanteric fracture of her hip.

22      MR. PATE:          And I'm sorry, the inter … .

23      DR. CONLEY:          Right.

24      MR. PATE:          You used a word inter … .

25                              -29-

1   several days later.

2       MR. COOPER:          Now and just so we are perfectly clear

3   when, here where Dr. Lapkass is referring to a displaced

4   fracture at the base of the neck, he's talking about the neck of

5   the femur which you've previously described.

6       DR. CONLEY:          That's correct.  That's what

7   intertrochanteric means.

8       MR. COOPER:          Thank heavens you doctors can say words

9   like that.  I turn your attention next doctor, to page 12 of 22,

10  do you see that?

11      DR. CONLEY:          Yes, I do.

12      MR. COOPER:          Okay.  Those are your original doctor's

13  orders entered on December 4, of 2000, at approximately 1600,

14  correct?

15      DR. CONLEY:          That's correct.

16      MR. COOPER:          And then there is also a notation, see

17  it says noted M. Hausand, RN 12/4/00 1730.  Do you know whose

18  handwriting that would be?

19      DR. CONLEY:          A nurse by the name of M. Hausand.

20      MR. COOPER:          And is that the standard practice in

21  December of 2000, that the physician would write the orders and

22  the RN that signed it before would read those orders and then

23  make such a note as defined here in this case?

24      DR. CONLEY:          That's correct.

25                          -49-

1    DR. CONLEY:         Yes.

2    MR. PATE:           Okay.

3    DR. CONLEY:         It isn't clear because on the last

4    page, the date of admit is 12/5.

5    MR. PATE:           Dr. Conley, can you tell me what, and

6    I'm going to mispronounce this, iatrogenic, that's I A T R O G E

7    N I C, what that word means?

8    DR. CONLEY:         Iatrogenic means physician caused, I

9    guess it is.  If I give you penicillin and I know that you are

10   allergic to penicillin, that injury is (unintelligible)

11   (unintelligible) (unintelligible) (unintelligible).

12   MR. PATE:           Doctor, I'm handing you what's been

13   marked as Plaintiff's Exhibit 2 to madam clerk and Mr. Cooper.

14   DR. CONLEY:         Okay.

15   MR. PATE:           Do you want to just, I mean consistent

16   with what Mr. Cooper has been having you do, if you would like

17   to take a few seconds just to look at it.  And it is five pages,

18   just take a second to look at it.  And we will go off record so

19   I don't do it on … .

20   COURT REPORTER:     Off record.

21   COURT REPORTER:     Back on record.

22   MR. PATE:           So Dr. Conley, I'd asked you what the

23   meaning of the word iatrogenic is.  And you told us that it

24   meant physician caused.

25                                -39-